I represent the appellants in this case. It's a counterfeiting case, and there are three main issues that I'd like to discuss here today. The first one being the striking of the pleadings under Rule 37. The second one being subsequent judgment that came about, which included treble damages, fees, and costs. And the third one, third issue, is the dismissal of the counterclaims. With regards to the first issue, striking of the pleadings under Rule 37, it is very clear that this is a very severe sanction. It deprives due process. And for that reason, we ask this Court to take a very careful look at the record in this case. You know, everybody comes to the bench with different experiences. Mine includes eight years as a state trial judge, in which I heard literally thousands of discovery disputes. And, of course, as a lawyer, I participated in discovery disputes. So this struck me as kind of strange, because it's very unclear to me what you had that you didn't produce. Right. So I realize that there were arguments, you know, about whether there had been a 26F proceeding. I get all of that. But at the core, what documents did your client have that you all did not turn over, for whatever reason, based on whatever objection? Can you tell me that? Right. Your Honor, we turned everything over. And the main evidence of this is that this case started with a seizure, execution of a seizure order that was issued ex parte. Something we didn't know about. They came to our warehouses, all of our offices, and took everything that we had. All of our servers, all of our computers, all of our cell phones, all of our documents, goods, and everything. They took everything. We didn't have anything that we did not produce. And that is the issue. One of the main discovery issues in this case was related to our responses to requests propounded by the appellees. Right. But what's important here is that the appellees never filed a motion to compel. Right. And I will submit to you that they never filed a motion to compel because it wouldn't have been proper. And let me explain why. One of the requests were interrogatories, 87 interrogatories that were propounded. Right. They submitted a status report indicating that our responses were incomplete, evasive, insufficient. That the matter was heard despite without a motion to compel. The matter was heard by the court. The court took recess, reviewed our responses, came back. There was further discussion on the responses. At the end of that hearing, the court struck the objections. Our responses included objections. And then without waiving objections, we had the complete responses. The district court struck the objections, but retained the responses. There was no order for us to further response or supplement our responses because they were complete. Are we talking about two different events here? Number one, I mean, I'm asking you so you can correct me if I'm wrong. So you had the raid in which they took a bunch of materials that would have included not only the physical and then you had a second wave where you gave specific responses to discovery. If I don't have it right, clarify it. Sure. So the case started with the execution of a seizure order issued ex parte. They took everything we had. And then later on, as the case proceeded, one of the points raised by appellees was, we took so much stuff, we don't really know where everything is or what everything is. And so they propounded 209 requests for documents and 87 interrogatories seeking more information than what they had already taken. And in response to that, we provided 11,000 pages of documents, all of which had already been taken by the appellees. By this point, they had returned the servers, the computers. But they could download from the service because there's also this argument about you gave us these because I can remember the days of actually having to go through papers and they weren't searchable by any other way than your eyes. So I'm not familiar with a rule of documents that says we have to make it easy for you to review our documents. You just can't deliberately make it hard, like take the files and start shuffling them around so they don't make any sense. But if the files are poorly kept by the client, that's you produce them as they're that's not, as far as I know, unless I'm missing something, a violation of anything. That's just how it goes. If you deliberately make the computer hard to read or you deliberately mess up a file, either paper or computer, I get that. Or if you give somebody a computer file that can't be opened. But I'm just unclear on this notion that you all were responsible for running a more clean business. I mean, you run the business you run, and not every is particularly good at keeping files, either paper or computer. Yes, Your Honor. That's exactly our point here. The documents that we did end up producing in response to the discovery request came directly where electronic files came directly from our servers and computers that had been returned. That you all, that your company was using that way, in other words, the version, whether it's searchable or not or easy or hard, is what they were day to day living with. Correct. If it was messed up, then it's the analogous to the messed up file folders. And that's just how it was kept, right? That is correct, Your Honor. Okay. So then I can understand the need for the interrogatories. Like, we don't understand all these documents because your client kept them in a messy way. What was what about the interrogatories did you all not respond to? I mean, I know you said you made objections and were subject to blah-biddy-blah. What was left out of the interrogatory answers? So nothing was left out of the interrogatory answers. And for that reason, the Court didn't issue an order for further responses. And there was never a motion to compel filed indicating that anything was left out. It was simply status reports issued to the Court without giving us an opportunity to oppose. And those status reports included these broad allegations that our responses were incomplete. There were no specifics provided. After that hearing, there wasn't a motion to compel. There was an accusation that your executive officer, whatever his name was, did not... He was directed to sit for a deposition, and he was not prepared for that deposition. Is that... What do you say to that? Yes, Your Honor. There was that incident that took place. It was a deposition pursuant to Rule 30b-6 that did take place. The deposition did take place. There were a number of responses that were asked in that deposition that required the deponent to refer to documents for accurate responses, and those documents had not been provided during the deposition. And that was something when we raised with the Court, when the issue was brought to the Court, the documents that were required for him to accurately respond to those were not provided in that deposition. Myself with opposing counsel, we had agreed that we would submit responses to all the questions that they needed answers to by a certain date, but that date was post the... That sort of raises another thing that I've been wondering about. I mean, it sounds like y'all did talk some and try to resolve things, but it just doesn't seem like y'all tried to settle anything here. And why is that? Why have y'all not made more of an effort... Right, and that's a discovery dispute or the bigger picture. Yeah, and that's a good point, Your Honor. One of the, you know, one of the requirements for Rule 37 is it has to be a good faith effort to resolve discovery matters before it goes up before the Court. That never took place in this case. There are the status reports that were submitted to the Court without any conference with us, and in fact... Did you try to call opposing counsel and say, look, let's meet at, you know, the coffee shop and kind of work through this stuff, and they refused or what No, I did not do that, Your Honor. I did not make that call to try to resolve these matters. And here we are in front of the Fifth Circuit, and y'all still haven't tried? Seems a little weird to me because, I mean, look, I had a lot of these cases, and sometimes I sent them to go have coffee and, you know, just try to talk to each other. I didn't order coffee. I mean, I realized that, but I recommended it, and guess what they did? And guess what? They stopped coming back and having because they actually talked to each other, and that's a nice touch. That's required, as you say. The concept of conference is not an email saying, please admit that you have violated all the rules of civil procedure, ethics, and evidence and should be sanctioned, failing which I'm going to file a motion. And so y'all have not conferred? We did not. Ever in this whole process? Not on this matter. We had one conference, which they considered it to be a Rule 26-F conference, but it wasn't much of a conference. It wasn't much of a discussion. But no, we did not admit. There's no recollection of us having a conference related to these discovery disputes. And in fact, I want to raise one particular issue. There was this issue about modifications made to the records of our supplier, United Wholesale. That issue was literally blindsided. We were blindsided with that issue in court. It was raised at one of the hearings, and in the hearing, I raised to the court the fact that I had never received the documents which they were relying to make these accusations. A copy of it was never shown to me while this hearing was taking place. The court was questioning the representative of the wholesaler, the third-party wholesaler, and while this is happening, I was almost clueless as to what was happening because I never had a copy of the documents that they were looking at, both the court... They being the court and your opposing counsel? The court and They did not produce documents to you? They gave me copies of those documents after that hearing. And I asked the court. It's on the record. I told the court I didn't receive copies of the documents which you're looking at, and then the court instructed them to provide copies of them after the hearing. Right. So I didn't really know what it is that they were talking about during that hearing, and I never had an opportunity to cross-examine the representative. And I just want to understand, with United Wholesale, the judge felt that you all were responsible for their documents. Is there any relationship between your client and United Wholesale other than a buyer-seller relationship? Is there any ownership, alter ego, any allegation of that? No, Your Honor. That was strictly... So what basis would you have to force United Wholesale to do anything? There's no basis. There's no way we have any type of control for the United... of their records in any way, shape, or form. In fact, our documents, our version of documents that mirrored the documents that United Wholesale had, had been seized before the case started. So any kind of modification or discrepancies would have been obvious by their records and our records that had been seized before the case had begun. And none of that was presented to the court. These were simply allegations that were blindsided with at a court hearing and didn't have... really have a meaningful opportunity to defend ourselves with. You had two other issues, and you're running out of time, so... Let me cover damages. The damages that were issued were really speculative. There was evidence of 150 cartons purchased from this one third-party supplier. Then the court did some extrapolations and speculations indicating that since 150 were purchased in a four-month period, that means they must have purchased 150 every four months for the last three to four years. There was no evidence to support that in any way. The fees were extremely unreasonable, very inconsistent with the American Intellectual Property Law Association report in 2017, not consistent with the averages. And then the costs, the costs included costs that were not allowed, not recoverable under statute. And this was... the award was contrary to the finding of the Supreme Court's case, Remini Street v. Oracle. How much approximately were the attorneys' fees by themselves? Now, I'm not talking about the costs or the statutory damages. Right, I think the attorneys' fees were over a million dollars. And then the costs were, I think, three or four hundred thousand. And damages, I think, were about two hundred thousand, treble. Those were treble damages. With regards to counterclaims, I think there was some confusion with the district court on this matter. We brought counterclaims of wrongful seizure. I think the court was confused because it... I think it weighed the merits of the two claims of trademark infringement and the counterclaims of wrongful seizure. And I think the way the court saw this was, if I ordered a seizure and the seizure did result in... the seizure order did result in the seizure of counterfeit goods, then the seizure could not have been wrongful. Right? It was one or the other. And that is not the law. The law says that even if the trademark owner can prove infringement, even if there was infringement, there's still a claim for... potential claim for wrongful seizure. They're independent of one another. Wrongful seizure relies on other factors than infringement. One of them is the seizure order was sought in bad faith, which in this case we showed evidence in our counterclaim well, allegations, factual allegations that there were in bad faith. A lot of misrepresentations in the... in seeking the seizure order. A predominant number of the goods were legitimate. In this case, we believe there were. We already knew that they had market value. Thirty percent of the goods that they took were completely unrelated to their trademark. Number three, it was executed improperly. We had a case where they came in, they locked people up in rooms for three hours without allowing them to interact with one another. Then they took them to another room and interrogated them one by one. That is something that was not allowed in the seizure order, and it was done in this case. Executed improperly. One of the things, one of the options, it appears that Judge Hughes had a negative view of your client and its actions sort of from start to finish. For whatever reason that was, we of course have the option, which we don't exercise very often, of sending the case back and having it reassigned to a different district judge. You haven't asked for that, and I'm just wondering why you have not. No, I would do so, Your Honor. I would do very much like to ask, make that request for this case to be remanded and reassigned to a different judge. All right. Thank you. You saved time for rebuttal, Mr. Teran. Thank you. Ms. Ballard? Were you able to pick up okay on what was being said? Yes, and I apologize. I wear hearing aids and I'm hearing impaired, so I'm sitting and I was able to hear,  That'll be fine, but if you need anything repeated, just please let us know. My name is Marcella Ballard. May it please the Court, I represent North Atlantic Operating Company and National Tobacco, the plaintiff's appellees in this matter. The key issue, I believe, and one that you're wrestling with is whether or not the Court made sufficient and proper factual findings to find that there was bad faith intentional contumaciousness and willfulness in disobeying four separate discovery orders and having four separate proceedings and hearings in this matter that culminated in a two-day proceeding in which the testimony was taken of the appellant, Mike Sohani, who was also the 11,000 documents. There's really no one human being who could possibly prepare well enough to know them all by heart. So if you're going to ask him questions about things that are contained in the documents, don't you have to show him the documents? So the documents that we're talking about that he was unable to talk to, speak to, were the transactions concerning the counterfeit merchandise. So when we got to the third status report and hearing on the matter that occurred in September, the Court finally said, produce bank records, line them up with the invoices and the purchase orders, and show me an organizational chart that describes the relationships between Mike's Worldwide Incorporated, Mike's Novelties, Mike Sohani, Alex Sohani, Anis Verani, and the three smoke shops at issue. That org chart, it's important because on January 19th when Mike Sohani was ordered to come into court and answer the questions that he was unable to answer in November in his 30b6 deposition notice, and again it's not about the 14,000 pages, it's about the transactions that resulted in the counterfeit product that was seized in his warehouse. But even there you want to be, you want to want to get it right, so you want to have the documents in front of you. I mean, I understand the concept. He had the documents. Okay, but it's my understanding Mr. Turan is saying you didn't show him the documents, that you were asking about things that were documented and not shown to him. Okay. You didn't show him the documents. He went through a full day not only of his 30b6 deposition but also his own testimony as an individual. He was unable to describe, he was asked, for example, who is the owner of the wholesale facility at which the counterfeit product was found. He was unable to to testify as to the ownership relationship of Mike's Worldwide and Mike's Worldwide Incorporated. I thought they sold one of them or something. They sold the inventory of Mike's Worldwide. And the use of the name. No, they sold the use of the name to Mike's Novelties, which was a retail shop across the street. They sold all the inventory of Mike's Worldwide LLC six months after the case was filed without testifying to that in the deposition nine months after the case was filed. That was only discovered in the January 19th hearing when he came in to testify. And counsel's representation that everything was produced and everything was in was taken is absolutely incorrect. What documents do you still not have? That the tax returns of all the individuals, pardon me? You said that the tax returns weren't filed because they weren't exist, they didn't exist. Only for Mike's Worldwide LLC. Not for Mike's Worldwide Incorporated, Novelties, Mike Sahani, Alex Sahani, Anees Farhani, and the three smoke shops. We did not get those. Nor did we get any discovery responses whatsoever from any of those individuals or the BRNSS smoke shop. Nothing. Not any written responses. Okay, wait a minute. So do they, I guess what I'm trying to figure out, I realize there's all these different entities and so on, but y'all came and basically swept out the building. What else do you need? What else did we need? We needed to the bank records that showed when they purchased from their supplier zigzag orange products and when they paid for them and to whom. And those were entirely missing. We could not find them in the 14,000 pages of documents that they say they produced in a PDF. We understand that we needed to print that out. They crashed our computer. We did print out those papers. We did not find any records of transactions between and so still today you are sure there are documents missing. Like if we sent the case back, there would still be documents missing as of today. There were never any documents produced as to the purchase and sale of the counterfeit product. So why was there never a motion to compel as to anything? Why was there never a motion to compel as to any witness or any document or anything else? The management order that Judge Hughes issued in June in this case when he entered the protective order so that we could proceed with discovery and when he acknowledged that a World 26F conference had in fact occurred stated that discovery could now proceed and he would then be holding regular conferences which he did do over a period of time. The status reports which we submitted in our record excerpts which are 43 through 47, 49 through 54, and 55 through 60 are essentially motions to compel. It details every single item that was missing, namely the written responses, the bank records, the tax returns, the transaction records of the counterfeit merchandise that we seized. In essence they were just missing and then they didn't respond. And where would they be if they're not in the building that you swept up? I don't know. If we could make a conclusion at the end of the case that they didn't maintain records, for example, we would have to look at the tax returns to see how they reported their income at the end of the year. We weren't able to get those either. There are eight appellants. Only one of the appellants had the audit delay issue that you speak of. The other seven did not. We did not get those. But most importantly, I think the really good example here is the testimony of Mike Sohani that came in on January 19th before the case was terminated. When he was presented with the organizational chart that the judge ordered him in September to complete, which not only was organizational chart of all eight entities, but the relationships between the people and who were the owner operators of the various companies. There was nothing on there describing those relationships or who owned what. And when he was given to Mike Sohani on January 19th, he asked if the appellees created the chart. So not only did he, he was completely unaware of where the chart came from. But that aside, in those record deposition, was it just a general notice or did it specify things that the witness should be ready to respond to? There was a list of about 10 topics. The first two were the business organization of all of the defendants in the case. And the second one was the knowledge of the purchase and sales of zigzag orange products, genuine or counterfeit. He came into the deposition and said, I glanced at the topics this morning. I didn't really look at them. I haven't made a review of my records and I don't know anything about purchases or sales of zigzag orange, which was the product at issue in the case. And he testified not one word about the fact that the main wholesale entity, the one at which the counterfeit products were sold, the inventory had been sold five months prior to the deposition. You know, I'll tell you the difference between a status report and a motion to compel. In a motion to compel, you would have had to confer with opposing counsel. And so other than this debatable June meeting, whatever that was, what conferring have y'all done to try to resolve this? We conferred after receiving their answer and counterclaims when the answer included five affirmative defenses for patent infringement. And this is not a patent case. And he, counsel said, I stand on my answer. So we had to move to dismiss. Then the affirmative defenses were struck and we moved to dismiss the counterclaims. The counterclaims are important. No, let me put it this way. I'm speaking about, you said the status reports were essentially motions to compel. Status reports deal with discovery. Discovery disputes require conferring so that judges and magistrate judges aren't wasting time having discovery hearings when the lawyers haven't talked. What talking did y'all do in response to these status reports? You and your opposing counsel, not in front of Judge Hughes and not as you're walking into the courtroom, but separate from that. We sent the deposition notices and the discovery after the June conference when discovery commenced. We called, emailed, wrote a letter, and left three voicemails. We did not receive any response until a month later, two days before the depositions were going to occur, that they were objecting because there was no World 26th conference. So you know why they thought that because Judge Hughes said that. So we don't, we're not doing that. That's not how we do things here. Here's how we're going to do it. So I mean, I can see that, but I guess what I'm trying to say is you wrote a status report, these things that are in the record excerpt, you file that. Did you confer about the documents that were missing, about the tax returns, about did y'all have a conversation where you said where are Mr. Sohani's tax returns? We reached out in the effort in trying to schedule the depositions and the response that we got was that everything has been exactly what he just said here. Everything's been produced. We've complied with everything. So the answer to Judge Haines' question is no, is what I think. Is that right? We did reach out on five different occasions and we received a response that he was in compliance. So we were not, we did not, we did not, we were not able to confer further. What was the response? Pardon me? What was the response? His response was that we had fully complied. But I mean, so you then, I under, I've been there, I've been there back when this was a fax fight. You would send a fax and they'd respond with a fax and then they'd turn off their fax machine so you couldn't fax back. I get this. I've been through this as a lawyer. I've been through this as a judge. To me, conferring is not leaving nasty voicemails or even nice voicemails. It's talking. Did y'all talk and say, where are Mr. Sohani's tax returns? We understand about the audit of Mike's, but Mr. Sohani's not under that audit. Where are his tax returns? Have you had that conversation with Mr. Tarrant? We did reach out and the only response that we got was his representation that everything had been complied with. We were not able to, we did not confer further outside of court. So again, the answer to Judge Haines' question is no. He did not do those things. No, but we tried. What were your, you had 11 lawyers on this case? Well, we had our local counsel and the reason why we had the initial lawyers at the outset was because the raid that we did was at three different locations and we needed to have a couple people at each location. We are the relationship lawyers in New York for the client and then we had local counsel in Texas. No, we didn't have always 11 lawyers on the case. But anyway, you ran up over a million dollars in terms of fees? Under a million, yes. It was $900 in change. What was the reason for all of that legal service? So one example is in the counterclaims we had to move to dismiss them two times and then finally in the status conference a third time because he was asked to provide factual basis for who, what, when, where. For example, on the false imprisonment or the wrongful seizure or the grudge that for us bringing the case and he did not do that. Just filed the counterclaims a second time and then a third time without providing the factual details. We had to keep making motion practice. For example, we had to return the electronic devices which were being copied. In that interim time, he filed an ex parte motion, emergency motion to return the electronics after the judge had said they have an additional 72 hours. We had to respond to that. There were several motions that were unnecessary but they had to occur because we weren't getting anything in this case. I mean that's very weird because it seems like you kind of have two arguments. One is we got too many documents and one we didn't get enough. It seems like your main argument is you just want them to sort through the documents for you and I don't think that's how it works. I just looked again at the rules to make sure I didn't miss something but they say you're supposed to produce them as their cap and ordinary course of business. That's been the law for 30 plus years as long as I've been a lawyer. They did shift the burden to us and I understand that we do have to go through that but they did not submit for five out of eight of the appellants written responses either to interrogatories or the document requests and they did not fill out the organizational chart. So we still, as we stand here today, don't have a clear understanding of the structure of the assets and inventory. Anything else? You're not required to use all your time. I think your associate has something to mention. On the wrongful seizure counterclaims, the seizure confirmation hearing was held pursuant to 15 U.S.C. 1116 the day after the seizure occurred. All of the goods were present in the courtroom as well as our testifying witnesses. A preliminary injunction was entered and the seizure was confirmed pursuant to the statute and none of these objections were made at that time. So the counterclaims, in addition to not being supported factually on three separate occasions when they were filed, were not, it was not objected to at the time, the appropriate time to do it, which would have been the seizure confirmation hearing. It's always hard to be the one pulling on the jacket. Sorry. And finally, part of the wrongful seizure counterclaims that individuals were falsely imprisoned, that was raised, that did not occur. However, the judge specifically asked counsel to name the individuals the amount of time and the method by which they were falsely imprisoned or detained when they filed the counterclaims the second and third times, and that was not done. Ms. Ballard, I don't know what we're going to do with this case, but at least one of us, me, I think the case has really gotten messed up and it may be necessary for us to vacate the judgment and send this case back to a different judge. What do you say about that? And if that's on the horizon or on the prospect, we would like the parties to meet with, can I go ahead and say this, with our conference attorney, who is a mediation expert, immediately after argument to explore not only how this court can get a grip on this case and find out what's, the things that are not in the record, I'm not sure we can even decide the discovery issues. Anyway, we would like for you to meet with him to see if he can assist us in that respect and is there a possibility of settling this case so that we would not have to cause it to be handled all over again by another judge. Okay, so in response to your first question, actually it's your second question, would we be willing to meet with the conference coordinator here in the Fifth Circuit about a resolution? The answer is yes, and corresponding to that, that obviously includes speaking with opposing counsel and trying to confer and discuss a resolution, so yes. As to vacating or remanding to a different judge, we don't believe there's any reason to assign it to a different judge. There hasn't been any allegation of bias or a monetary interest in the outcome or anything of that nature. Well, but this judge has imposed the most severe sanction imaginable without even considering something short of that and even without a motion to compel, so it seems that his mind is more or less made up. So that sanction was raised in September in the status report that I referred to in our record excerpt that we would be seeking terminating monetary or after that September statement that we were going to seek those sanctions. We took two days of depositions in this case of Mr. Sohani and Mike's wholesale in which he failed to respond to the transactions or the business structure of the many defendants, and then we went in for a two-day hearing in which five hours of testimony were taken of Mr. Sohani and was still unable to respond to those. So when the motion for sanctions was made orally to Judge Hughes, the response was not allow me to brief it, allow me to produce the tax records, the bank records, the written discovery responses of the five who haven't responded and point you to the transaction records for the counterfeit goods. The response was we fully complied. All right. Thank you, Ms. Ballard. By the way, so Mr. Shundook, our conference attorney, has been here for the oral argument and he will be introducing himself to you when we recess. We don't require anyone to participate in those proceedings, but it's a terrific and very talented resource that's available, and so Judge Dennis was correct in mentioning that as an option and an opportunity for both of you. Okay, Mr. Tarrin, for rebuttal. So Ms. Ballard indicated that your 30B-6 witness showed up and said, I'm paraphrasing, I just glanced at the topics this morning and I haven't read the documents. Is that what happened? So the company that we're dealing with, Mike's Worldwide Elements . . . No, I'm asking you a direct question. Is that what your 30B-6 witness said at the beginning of the deposition? If I've misstated it, correct me on what he said. That's correct, Your Honor. My recollection is that that is . . . All right. I mean, a 30B-6 witness, you're obligated to produce someone. You get to pick who it is, or numerous witnesses who are knowledgeable about the subjects that are listed. So what possible justification is there for having a witness that showed up and said, oh, I just saw the topics this morning? So the 30B-6 witness for this entity, Mike's Worldwide LLC, is a very small entity. It has one officer. It has one owner. It has one employee, which is a stock person. They stock on the shelves. He was really the only  one. Aren't you required to prep him? I've never produced a client for a deposition that I didn't meet with in advance to visit with the client about the kinds of questions that would be asked. So, Your Honor, I don't want to get into attorney-client previous communication, but yes, I did prep him. I did prep him ahead of time, but he did say what he said. I believe in deposition. I can't speak for why it is that he said that. I don't know if he forgot or I that was his representation. I guess it's possible you could have prepped him without showing him the document. So he says he's seeing the document for the first time, but he's still been prepped, but it's not the best situation when a client puts you in that position, but here we are. Now, what about her response to her conference? She said basically she kept calling, I guess they don't fax anymore, writing, emailing, writing, sending the horse-drawn carriage with the note on top or whatever, and you didn't respond. What's your response to that? So we didn't receive those types of communications, and I'll explain to you why that doesn't make sense, right? Because when they submitted their status reports, one of the status reports indicated that we did not produce all the documents that they had requested, right? That was very clear in their status reports. So there should have been conference at that point. At that hearing, subsequent to that status report, it was revealed by them that, in fact, we produced 11,000 pages, and by that time they had only reviewed 4,000 of the pages. That's less than half. So they hadn't fully reviewed it. Let's just bear down on it. Had you given them Sohani's tax report record? At that time, the tax reports did not exist. Sohani as well, he was in the audit world. All of these eight entities did not file 2015 tax returns at that point? Yeah, I think the request for 15 and 16, and at that point, I think there was one or two that may have, and we produced those, and then the other ones, they didn't. So none of them had tax returns? Correct. Okay. What about bank statements? Were those produced? Those were produced, and they subpoenaed bank records directly from the banks themselves. So I am under the impression that they're duplicates. What we produced was exactly the same than what they had received. Well, sometimes people have kind of side bank records, but that's another story. All right. What about this notion that when they were trying to set up the deposition, they called you, emailed you, and something else to you, and you That was related to the first notices of depositions. Initially, in the case, they had sent us notices for three depositions, and when we received the letter, and in addition to the three deposition notices, at the same time, they sent us 220 requests for productions and 87, I believe it was 87 interrogatories. It's on the record, right? A large number of documents, a large number of requests. We were sifting through everything before we were able to respond. One of the issues that we raised was that such discoveries, such depositions were not appropriate at that time because Exactly. Let me just say this to both sides. It's been a long time since I've had to deal with discovery fights because we don't get very many of them at this level, but they do not get better by writing more emails. I realize you're in California, so maybe you can't meet in person, but you have to at least have to set aside your dislike of the other person and literally walk through stuff calmly and try to work things out. That's just how it works. I have certainly dealt with difficult opposing counsel as a lawyer. I've seen difficult opposing counsels as a judge, but that's how it works, and if both of you are doing that, then you can get things resolved, and that's regardless of how this case comes out. It's just I can't help but give that advice to swallow your pride and have some conversations. It's remarkable how much can get resolved when people put aside their anger and their nasty emails and just talk about what they really need and what they really have and how to work that out. So that's just my thought. Thank you, Your Honor. Any questions? Your case is under submission, and the Court will take a very short recess before